Richard G. Harris, Esq. – State Bar No. 97608
John T. Maxwell – State Bar No. 106826
**DUMMIT, BUCHHOLZ & TRAPP**
11755 Wilshire Boulevard, 15th Floor
Los Angeles, California 90025-1506
Telephone (310) 479-0944
Fax (310) 312-3836
Attorneys for Defendant, THRIFTY PAYLESS INC. dba RITE AID
(erroneously sued as RITE AID CORPORATION)

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST L. BONNER, JR., M.D.,<br><br>        Plaintiff,<br><br>    v.<br><br>RITE AID CORPORATION, and DOES<br>1 through 50,<br><br>        Defendants. | Case No.:  2:19−CV−00674−MCE−JDP<br><br>**DECLARATION OF JANET HART IN SUPPORT OF DEFENDANT THRIFTY PAYLESS INC., dba RITE AID PHARMACY'S MOTION FOR SUMMARY JUDGMENT / ADJUDICATION OF ISSUES**<br><br>**DATE:**  December 15, 2022<br>**TIME:** 2:00p.m.<br>**COURTROOM:** 7<br><br>*[Filed Concurrently With: Motion for Summary Judgment / Adjudication of Issues; Declarations of Kimberly A. Hoffmann, PharmD, APP, BCPP, BCGP and John T. Maxwell, Esq.; Notice of Lodging Records; [Proposed] Order and [Proposed] Judgment]*<br><br>**SAC Filed:   03/09/2020**<br>**TRIAL Date:   Not set** |

I, JANET HART, declare and state as follows:

    1.    I am the Director of the Government Affairs division of THRIFTY PAYLESS INC.,

dba RITE AID PHARMACY (hereinafter "Rite Aid").  I am aware of the matters stated herein of

---

my own knowledge and, if called upon to do so, I could and would competently testify thereto in a court of law.

2.      I graduated from Duquesne University in 1984 with my bachelor of science degree in Pharmacy.  In May 1984, I began working for DEFENDANT Rite Aid.

3.      In March 2019, I was employed by DEFENDANT Rite Aid and worked in the compliance department.  I was involved in the investigation of PLAINTIFF Dr. Ernest L. Bonner, Jr., M.D (hereinafter "PLAINTIFF").  I am currently still employed by DEFENDANT Rite Aid.

4.      As a Director in the Government Affairs and Regulatory Affairs divisions, I am responsible for delivering the insight, expertise, and leadership needed to support the growth and compliance of 2,440 drugstores in over 18 states.  I oversee all government reporting of required prescription drug data to state Prescription Monitoring Programs and manage the policies, procedures, training, auditing, and analysis needed for compliance with Federal mandates (i.e. the United States Drug Enforcement Administration and Federal Controlled Substances Act).  I am responsible for monitoring and managing the reporting of controlled-substance prescription data to 18 state governments.

5.      I am also part of a panel that reviews investigation files and determines whether any remedial measures need to be taken.  The panel is part of an investigation/review program assembled by the Regulatory Compliance Department in March 2013, specifically geared towards compliance with the United States Drug Enforcement Administration, Code of Federal Regulations Title 21, and the Federal Controlled Substances Act, wherein pharmacies are required to monitor the dispensing of controlled substances, reduce the potential risk of abuse, and minimize dependence liability.

6.      Rite Aid provides policies and/or guidelines to its employees regarding how to properly monitor the dispensing of controlled substances, reduce the potential risk of abuse, and minimize dependence liability.

7.      Rite Aid's "Procedures for Validation and Dispensing of High Alert Controlled Substances" specifically states, "Pharmacists are required by DEA regulations to ensure that prescriptions for controlled substances are dispensed for a legitimate medical purpose" (attached hereto as "**Exhibit A**").  The pharmacists' requirement to perform their due diligence in validating

DECLARATION OF JANET HART IN SUPPORT OF DEFENDANT THRIFTY PAYLESS INC., dba RITE AID PHARMACY'S MOTION FOR SUMMARY JUDGMENT

the legitimacy for each High Alert controlled substance prescription is reiterated in Rite Aid's "NexGen Automated Red Flag Documentation Process for High Alert Controlled Substances" (attached hereto as "**Exhibit B**").

8. Rite Aid's policies further state that "A pharmacist that knowingly fills or continues to fill a prescription that is not issued for a legitimate medical purpose could be subject to penalties, both criminal and civil, for violations of controlled substance laws and regulations, in addition to disciplinary action, up to and including termination." Rite Aid provides a 6-step procedure for validating and dispensing high alert controlled substances as follows:

A. Step 1: Receive Prescription

B. Step 2: Validate Prescription

C. Step 3: Validate Prescriber

D. Step 4: Validate Patient

E. Step 5: Determine, Using Professional Judgment, Whether to Dispense or Not to Dispense the Prescription

F. Step 6: Report Suspicious Activity (if applicable)

9. If a prescription is unable to be filled, Rite Aid instructs its pharmacists to "relay this information to the patient…" which "MUST be done in a respectful manner, [and the pharmacist must] never accuse the patient or make unnecessary comments." Examples include: "I apologize for any inconvenience, but based on Rite Aid's procedure for dispensing certain controlled substances, this prescription does not meet the requirements we have in place for dispensing these medications. Therefore we cannot fill this prescription" and "I apologize for the inconvenience, but I have not been able to successfully validate all required aspects of the prescription, so I am not able to fill it for you" (see "**Exhibit B**," pg. 6-7).

10. If there is suspicious activity, Rite Aid policies instruct the pharmacists to fill out a "Service Now ticket," wherein they enter their five (5) digit store number, where the issue occurred, and a description (i.e. prescriber name, prescriber address, prescriber DEA, and description of the suspicious activity).

// //

11.     The process for the investigation/review program generally consists of the following steps:

    A.  Step 1: A "suspicious subscriber ticket" is submitted by a pharmacist at a Rite Aid location;

    B.  Step 2: The ticket, along with analytics (e.g. data received from a compilation of various pharmacies nationwide) is reviewed according to Rite Aid's policies;

    C.  Step 3: If there is evidence of possible suspicious activity, then clinical protocol will be initiated, and an investigation of the prescriber will proceed.

    D.  Step 4: The analytics and results from the investigation will then be reviewed by an investigation/review panel.

12.     Typically, the investigation/review panel meets on a quarterly-basis and comprises of 3-4 members.  The decision to take any type of measure must be taken by consensus.  If a decision is made to discontinue filling controlled substance prescriptions from a particular prescriber, the prescriber will be given written notice of the decision.

13.     The decision is not permanent.  The prescriber may contact Rite Aid and request that their case be revisited.  Rite Aid will then continue to monitor the prescriber and may reinstate the prescriber as early as 6 months to 1 year.

14.     On January 21, 2019, a suspicious subscriber ticket was opened by a pharmacist [Kathy K. Lee] at Rite Aid location #06084 in Sacramento, California (attached hereto as "**Exhibit C**").  The ticket contained the five (5) digit store phone number, where the issue occurred, and a description.  The subscriber ticket's description stated, "Received Rx written from Dr. Ernest Bonner Jr dr notes states not accepted at Walgreens."  It further states, "Upon further investigation, the prescribers phone number is listed under different patient profiles [phone numbers omitted].  When we called the first number there was no answering machine or prompts.  The person just answers it as 'hello.' When asked to verify an rx they said no one was in the office until Thursday.  The patient wanted to ring the drs cell phone which we could not accept.  Is this Dr acceptable to fill for?  Unable to verify the dr info."

// //

15.     A member of my team received and read the subscriber ticket and presented the information to me.  I then began to review the analytics for PLAINTIFF.

16.     The analytics for PLAINTIFF showed that his prescriptions from all pharmacies (e.g. Rite Aid, Walgreens, CVS) for non-controlled substances had decreased from 45% in 2016 to 21% in 2019 (i.e. prescriptions for controlled substances increased from 55% to 79%) (attached hereto as "**Exhibit D**").   Oxycodone (a semi-synthetic opioid drug prescribed for pain), in particular, comprised of 41.5% of his overall prescribed medications.   Upon review of the analytics and subscriber ticket, clinic protocol was initiated and an investigation of PLAINITFF commenced.

17.     On March 29, 2019, I was part of a panel that reviewed a number of prescribers.  A decision was made to discontinue filling a total of thirteen (13) prescribers' controlled substances prescriptions.    Among those prescribers was PLAINTIFF.    The decision to discontinue PLAINTIFF's (as well as the other twelve (12) prescribers) prescriptions of controlled substances was unanimous.

18.     The decision to discontinue filling PLAINTIFF's controlled substances was based off of analytics, data, and other information incurred during the investigation, including, but not limited to the following:

    A. PLAINTIFF's high prescription of controlled substances;

    B. PLAINTIFF's prescriptions for controlled substances increased from 55% (2016) to 79% (2019);

    C. A high percentage (41.5%) of PLAINTIFF'S overall prescriptions was for Oxycodone;

    D. According to the United States Drug Enforcement Administration, Oxycodone is a Schedule II controlled substance (attached hereto as "**Exhibit E**").  Schedule II drugs "have a high potential for abuse, with use potentially leading to severe psychological or physical dependence" and "are also considered dangerous."   Moreover, Oxycodone has "historically been a popular drug of abuse among the narcotic abusing population" (attached hereto as "**Exhibit F**").

// //

E.   The investigation revealed that one of the addresses on PLAINTIFF's prescriptions was located at 2929 El Camino Ave. Sacramento, CA 92821-4215.  Two out of three (2 of 3) of PLAINTIFF's prescriptions in 2019 used that address (attached hereto as "**Exhibit G**").  When the Rite Aid investigation team visited the address, they found a dilapidated building (attached hereto as "**Exhibit H**").  Rite Aid investigators Christopher Morris and Robert Butler reported their findings, some of which were as follows: there was no physician's name on the placard outside of the office nor any type of clinic name on the door; there were multiple signs stating that the building was condemned; the "office park" appeared to consist of one main building with a couple of different unmarked doors; there was only one car observed in the parking area; and there were no cars entering or exiting the lot (attached hereto as "**Exhibit I**").  As such, the address was determined to be non-operational and invalid;

F.   Rite Aid's compliance with the United States Drug Enforcement Administration's recommendations and Rite Aid's policies regarding controlled substance prescription abuse; and

G.   Rite Aid's responsibility to reduce the potential that drugs dispensed at Rite Aid locations would be diverted and/or abused.

19.   On or around April 1, 2019, a letter was sent to PLAINTIFF informing him that Rite Aid locations would no longer fill prescriptions from his office for Schedule II, III, IV, and V controlled substances (attached hereto as "**Exhibit J**").  The letter further stated Rite Aid had made this decision due to their "concern about increased reports of controlled substance prescription drug abuse, especially Oxycodone" and reiterated Rite Aid's responsibility to "take appropriate steps to reduce the potential that drugs [they] dispense are not diverted or abused."  The letter also contained my contact information and stated "If [PLAINTIFF] had any questions" to "direct those questions" to me.

20.   The letter, dated April 1, 2019, was sent in compliance with Rite Aid's protocol and was generated using a template with general language.  The letter was only modified to include

// //

DECLARATION OF JANET HART IN SUPPORT OF DEFENDANT THRIFTY PAYLESS INC., dba RITE AID PHARMACY'S MOTION FOR SUMMARY JUDGMENT

PLAINTIFF's information (i.e. name, address, and DEA registration number) and type of drug that caused concern (i.e. Oxycodone).

21.    I personally have never spoken with PLAINTIFF, including any time before the incident to the present day.

22.    To my knowledge, PLAINTIFF has never made a request regarding his case reevaluation or revisitation.

23.    There is no documentation that suggests statements were made by any Rite Aid employee (including, but not limited to, pharmacists, pharmacy technicians, or store clerks) to PLAINTIFF or PLAINTIFF's patients regarding PLAINTIFF's reputation, license status, investigation, or nature of prescriptions.

24.    The investigation did not reveal any statements made by any Rite Aid employee (including, but not limited to, pharmacists, pharmacy technicians, or store clerks) regarding PLAINTIFF's reputation, license status, investigation, or nature of prescriptions.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

Executed this 29 day of June 2021, in Harrisburg, Pennsylvania.

_____
JANET HART, Declarant

DECLARATION OF JANET HART IN SUPPORT OF DEFENDANT THRIFTY PAYLESS INC., dba RITE AID PHARMACY'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# "A"

Exhibit "A"

#RXO0037-2013
3/1/2013

## Procedures for Validation and Dispensing of High Alert Controlled Substances

### Overview:

Pharmacists are required by DEA regulations to ensure that prescriptions for controlled substances are dispensed for a legitimate medical purpose. This legal responsibility is pursuant to DEA Title 21 Code of Federal Regulations and the Federal Controlled Substances Act.

A pharmacist that knowingly fills or continues to fill a prescription that is not issued for a legitimate medical purpose could be subject to penalties, both criminal and civil, for violations of controlled substance laws and regulations, in addition to disciplinary action, up to and including termination.

Rite Aid acknowledges that the misuse and abuse of prescription drugs is a growing national epidemic. Federal and State authorities, along with Rite Aid, are concerned and want to find ways to help curb abuse, while continuing to service and meet the legitimate medical needs of our patients. In order to assist our Pharmacists in assessing the legitimacy of prescriptions for controlled substances that are commonly abused or diverted, Rite Aid has developed procedures for assisting in the validation and dispensing of high alert controlled substance medications. The DEA has defined certain controlled substances such as oxycodone, oxymorphone, methadone, suboxone, hydrocodone and certain combination of products commonly known as the "trinity" (oxycodone, alprazolam and carisoprodol or any combination of drugs from these three drug classes) as being at a higher risk for abuse and diversion and as such these products will be the main focus for our procedures for validating and dispensing high alert controlled substance medications.

**These procedures should be used immediately**

### Procedures for Validating and Dispensing High Alert Controlled Substances:

Rite Aid Pharmacists must perform due diligence in validating the legitimacy for each controlled substance prescription presented for filling. For high alert controlled substances, as defined above, this validation process should be completed by following these 6 steps when the patient or prescription appears suspicious:

   Step 1: Receive Prescription

   Step 2: Validate Prescription

   Step 3: Validate Prescriber

   Step 4: Validate Patient

   Step 5: Determine, Using Professional Judgment, Whether to Dispense or Not to Dispense the Prescription

   Step 6: Report Suspicious Activity (if applicable)

Each step is explained in detail below.

#RXO0037-2013
3/1/2013

The laminated High Alert Controlled Substance Prescription Job Aid depicted below should be placed near the data entry terminal to be referenced and used as a resource.



☐ **Step 1:  Receive Prescription**

   ➢ **A. Prescription received at Drop-Off**

       o  Identify prescription as one of the high alert controlled substances

       o  If the patient is *not known* to the pharmacy:

           ⦁  Inform the patient or the patient's representative that this prescription may take additional time processing due to the validation process that must occur for this type of medication.

           ⦁  Obtain a valid government issued photo ID and document the following information on the back of the hard copy prescription.

               ▪  Name (Patient or Patient's Representative)

               ▪  ID type (Driver's License, etc.)

               ▪  ID #

               ▪  Any other data required by State Regulation (e.g. patient's Social Security Number required for KY PMP Program).

       o  For states that require ID at pickup, inform patient or the patient's representative that a valid government issued photo ID is required for picking up the prescription.

   ➢ **B. Prescription received by EPCS or fax**

       o  Continue to Step 2

   ➢ **C. Prescription that is phoned in**

       o  Follow state/federal requirements and/or normal Rite Aid procedures governing phoned in prescriptions.

       o  Continue to Step 2

#RXO0037-2013
3/1/2013

☐ **Step 2: Validate Prescription**

➤ Rite Aid Pharmacists must carefully review each prescription to determine its legitimacy.

o Does the prescription:

- ◦ Appear to be altered or forged?
- • Appear suspicious and dropped off at times when it would be difficult to contact the prescriber for verification (e.g. evenings or on the weekend)?
- ◦ Contain misspellings?
- ◦ Contain atypical abbreviations or everything is fully written out when normally abbreviations would have been used?
- • Appear unusual? (e.g. - internet print out, preprinted or stamped, prescriber's handwriting too legible, different colored inks or handwriting, erasure marks, etc.)
- • Not contain all State and Federal requirements for a controlled substance prescription, such as being written on a state required tamper resistant prescription blank?
- ◦ Contain writing or markings that would indicate it was rejected or filled previously by another pharmacy?

o If the answers to any of the questions above are "Yes", the Pharmacist must verify any questionable prescription with the prescriber.

o Pharmacists must keep in mind that even if the prescriber states that the prescription was written by them and is valid to dispense, it does not mean that the prescription was issued for a legitimate medical purpose. The Pharmacist must continue onto Step 3 of the validation process.

☐ **Step 3: Validate Prescriber**

➤ In order for a prescription to be valid, there must be a proper patient-prescriber relationship and the prescription must be written within the prescriber's scope of practice. The following is a list of "red flags" that MAY indicate that a proper patient-prescriber relationship does not exist:

o The prescriber writes for the same or similar medications in the same dosage quantities to most or all of his/her patients (e.g., oxycodone 30mg, 180 dosage units).

o The prescriber routinely prescribes the same "cocktail" or combination of drugs for pain treatment to most or all of his/her patients, particularly where DEA and other authorities have identified the combination as potentially abused (e.g., oxycodone, alprazolam and carisoprodol or any combination of drugs from these three drug classes).

o Prescription is for an excessive quantity.

#RXO0037-2013
3/1/2013

- o It is well known that the prescriber does not take insurance, or the patient has insurance but insists on paying cash for their narcotic prescriptions, especially for high-priced, brand-named drugs.

- o Patients from a particular prescriber come to the pharmacy in groups.

- o The patient or the prescriber is located outside the pharmacy's typical geographic area (e.g. patient's address is OH, prescriber's address is FL and your pharmacy is located in KY).

- o The prescriber writes a prescription for medication outside their normal scope of practice.

☐ **Step 4: Validate Patient**

  ➢ Pharmacists must:

  - o Review the patient's profile, if they are a Rite Aid patient, to check for the following:

    - Multiple prescribers

    - Payment trends (e.g. always pays cash for controlled substances, but has insurance)

    - Only prescriptions for controlled substances in profile, or only fills for a combination of products commonly known as the "trinity" (oxycodone, alprazolam and carisoprodol or any combination of drugs from these three drug classes).

    - Previous fills for current prescription as well as any other controlled substance

    - Early refills on controlled substances, where they paid cash stating lost prescription, going away on vacation, etc...

  - o Perform a DUR

    - Question high doses of controlled substances with excessive quantities for patients new to Rite Aid

    - Early refills for controlled substances should not occur more than 48 hours in advance (if allowed by State Law) of the scheduled exhaustion of their current prescription supply based on the directions provided by the prescriber.

      - If in your professional judgment such an early refill is warranted, it must be in accordance with all State and Federal Laws and you must obtain approval from the prescriber regarding the medical necessity of the early fill and document this on the hard copy prescription.

  - o Obtain a diagnosis code if there is question as to the reason or necessity of the therapy and document it on the hard copy prescription.

    - While doing your due diligence in validating these high alert prescriptions, prescribers may question or get defensive about why you are calling. We must be prepared to address their concerns professionally and adequately.

#RXO0037-2013
3/1/2013

- Explain that Pharmacists are being held accountable for the proliferation of prescription drug abuse and the DEA is looking to Pharmacists to curb the problem. While the responsibility for the proper prescribing of controlled substances is upon the prescriber, Pharmacists have a corresponding legal responsibility to ensure that prescriptions for controlled substances are dispensed for a legitimate medical purpose. Rite Aid is taking steps to protect our pharmacists, prescriber partners and our patients by validating prescriptions for certain high alert controlled substance medications. We understand that this process may seem burdensome, as it is extra work on both sides, but it is necessary and we truly appreciate their assistance to ensure we are able to keep servicing our mutual patients with legitimate medical needs

o Review the State Prescription Drug Monitoring Program (PMP, PDMP), in States where available, if the prescription or patient is suspicious. The PMP/PDMP includes a central repository for transmitted data related to the filling/dispensing of controlled substances.

- All Pharmacists MUST register for access to the PMP/PDMP in their state (where available).

- Please refer to portal (Keyword Search: PMP/PDMP) and review the PMP/PDMP bulletin for your specific State for details on how to register and access the PMP/PDMP program.

☐ **Step 5: Determine, Using Professional Judgment, Whether to Dispense Or Not To Dispense The Prescription**

➤ Pharmacists must use sound professional judgment to ensure they only dispense controlled substance prescriptions for legitimate medical purposes by following the above steps

o When dispensing:
  1. Pharmacists and technicians must ensure that information entered into NexGen and transmitted to the PMP/PDMP is accurate.
  2. Process and dispense
  3. Obtain a valid government issued photo ID and swipe/scan at pick up <u>if required by State regulation</u>.
     - A prescription requiring such ID by State regulation may not be sold without a valid government issued photo ID.

o When not dispensing:
  1. The Pharmacist must communicate the refusal directly to the patient or the patient's representative in a private area. **This MUST NOT be delegated to a technician or cashier.**
     - Have a communication strategy prepared for the denial as well as possible responses to any concerns or inquiries as to the reasons why we are denying their prescription prior to addressing the patient or the patient's representative.
     - Address customer concerns in a calm, controlled manner.

#RXO0037-2013
3/1/2013

- Be respectful and never accuse the patient or make any unnecessary comments.
- Below are a few examples of statements you could use:
    - ❖ If refusal is due to the prescription not appearing appropriate for dispensing:
        - ○ "I apologize for any inconvenience, but based on Rite Aid's procedure for dispensing certain Controlled Substances; this prescription does not meet the requirements we have in place for dispensing these medications. Therefore, we cannot fill this prescription." Note: Be prepared to explain which requirement is not met in case the patient questions.
        - ○ "I apologize for the inconvenience, but I have not been able to successfully validate all required aspects of the prescription, so I am not able to fill it for you." "I was unable to validate [insert specifics]"
    - ❖ If refusal is due to the prescription being too early to fill or refill:
        - ○ "I apologize for the inconvenience, but I am unable to fill this prescription today. I will; however, be able to fill it on [insert date]."

- ☐ **Step 3: Report Suspicious Activity (if applicable)**
    - ➢ Contact local authorities for any prescription that has been confirmed by the prescriber as fraudulent or forged.
    - ➢ To assist in the effort to curb inappropriate prescribing and/or the spread of prescription drug abuse, Pharmacists should immediately notify their Pharmacy District Manager and submit a RACS ticket (using the below procedures), to communicate their concerns about prescribing patterns, prescribers from areas significantly outside the pharmacy's typical geographic area, or if other pharmacies are refusing to fill prescriptions from a particular prescriber or prescriber group.
        - ○ Procedures for submitting the RACS ticket for concerns surrounding prescribers
            - ○ Select *New Ticket*
            - • Select *Corporate Communication* under issue area
            - • Select *Suspicious DEA Pharmacy Activity* under general issue
            - • Select *Reporting Suspicious Prescriber Activity* under specific issue
            - ○ Enter the following information:
                - ○ Prescriber Name
                - ▪ Prescriber Address
                - ▪ Prescriber DEA
                - ▪ Comments: Enter description of the suspicious activity

# EXHIBIT

# "B"

Exhibit "B"

#RXO0047-2015
3/10/2015 (updated 1/24/19)

---

**NexGen Automated Red Flag Documentation Process for High Alert Controlled Substances**

---

## Updates (1/24/19):

The Red Flags Questionnaire has been updated with the following:

➢ Addition of a new "hover" function – When hovering the mouse cursor over any Red Flag question, explanations and/or examples will appear to serve as consistent reminders of things that Pharmacists should be looking for when dispensing prescriptions for controlled substances

➢ Removal of the question *"Does the prescription validate?"* – Prescription validation methods have been incorporated in the hover function explanations for other Red Flag questions. If the prescription is not valid, make the appropriate Red Flag documentation, and notify local authorities when required (e.g. verified fraudulent, forged, or altered prescriptions)

➢ Addition of a large comments box for additional Pharmacist comments, if needed

➢ Addition of a defer option (e.g. RPh needs to verify a prescription, but the MD office is closed; Refill is too soon; additional information is needed, etc.)

**Reminder**: Please be aware that if the "Red Flag – Reject" option is selected, the prescription will permanently be deleted, flagged in the patient profile and the prescription cannot be restarted.

## Overview:

As you recall, in March 2013, Rite Aid implemented procedures for the validation and dispensing of high alert controlled substances. High alert being defined as certain controlled substances such as oxycodone, oxymorphone, methadone, suboxone, hydrocodone and certain combination of products commonly known as the "trinity" (oxycodone, alprazolam and carisoprodol or any combination of drugs from these three drug classes) that are at a higher risk for abuse and diversion.

Since Pharmacists are required by DEA regulations to ensure that prescriptions for controlled substances are dispensed for a legitimate medical purpose pursuant to DEA Title 21 Code of Federal Regulations and the Federal Controlled Substances Act, Rite Aid developed our procedures to assist our Pharmacists in assessing the legitimacy of prescriptions for controlled substances that are commonly abused or diverted.

NexGen version 42 standardized the validation process thereby assisting Pharmacists in determining whether to fill or not to fill a high alert controlled substance. The process is documented in NexGen as proof that due diligence has been performed.

This validation process should be completed by following the 6 steps depicted below when the patient or prescription appears suspicious (*See next page*).

#RXO0047-2015
3/10/2015 (updated 1/24/19)



These basic steps don't change with the newest NexGen version. The Pharmacist must still perform due diligence in validating the legitimacy for each High Alert controlled substance prescription presented for filling.  The entire process can be reviewed in detail in Bulletin #RXO0037-2013.

The Red Flag documentation process will appear after the data entry/clinical review or QA.  A new screen will appear with the required validation questions.



**#RXO0047-2015**
**3/10/2015 (updated 1/24/19)**

Red Flag validation questions are listed below in **bold** and will assist in documenting Steps 1-4 of the High Alert Controlled Substance Validation process as outlined in the diagram above. Responses to these questions will also assist in Step 5, *the use of your professional judgment to determine whether or not to dispense.*

**Note:** For any of the Red Flag Verification questions that are answered with 'no', a comment box will be enabled and will require the RPh to enter a comment in order to proceed.

☐ **Step 1: Receive Prescription**
  (The first 3 questions to be answered on the Red Flag Verification tab in NexGen relate to the procedures and information gathered in Step 1 of the validation process)
  ➢ **Are warning signs present with patient or prescription? (Yes or No)**
    ○ *Is there anything suspicious about the behavior of the patient or any Red Flags present?*

    ○ *Does the prescription:*
      ▪ *Appear tampered with, altered, forged, fraudulent or have Red Flags?*
      ▪ *Appear suspicious and dropped off at times when it would be difficult to contact the prescriber for verification (e.g. evenings or on the weekend)?*
      ▪ *Contain misspellings?*
      ▪ *Contain atypical abbreviations or everything is fully written out when normally abbreviations would have been used?*
      ▪ *Appear unusual? (e.g. - internet print out, preprinted or stamped, prescriber's handwriting too legible, different colored inks or handwriting, erasure marks, etc.)*
      ▪ *Not contain all State and Federal requirements for a controlled substance prescription, such as being written on a state required tamper resistant prescription blank?*
      ▪ *Contain writing or markings that would indicate it was rejected or filled previously by another pharmacy?*
    ○ *Alt F8 will display the prescription image if needed during this process.*
    ○ *If the answers to any of the "Does the Prescription:" questions above are "Yes", the Pharmacist must verify any questionable prescription with the prescriber.*
    ○ *Pharmacists must keep in mind that even if the prescriber states that the prescription was written by them and is valid to dispense, it does not mean that the prescription was issued for a legitimate medical purpose. The Pharmacist must continue onto Step 3 of the validation process.*
  ➢ **Is the patient known? (Yes or No)**
    ○ *Is the patient a regular customer at Rite Aid and you are familiar with their medical conditions?*
  ➢ **Was the identification recorded? (Yes or No)**
    ○ *If the patient is <u>not known</u> to the pharmacy, a valid government issued photo ID should have been obtained and the following information documented on the back of the hard copy prescription.*

      ▪ *Name (Patient or Patient's Representative)*
      ▪ *ID type (Driver's License, etc.)*
      ▪ *ID #*
      ▪ *Any other data required by State Regulation*

#RXO0047-2015
3/10/2015 (updated 1/24/19)

☐ **Step 2: Validate Prescription**
(The question to be answered on the Red Flag Verification tab in NexGen relate to the procedures and information gathered in Step 2 of the validation process)

➤ **Was the prescriber contacted? (Yes or No)**
   o *The prescriber will need to be contacted for any questionable prescription. If the prescriber is not contacted a comment will need to be entered to explain why.*

☐ **Step 3: Validate Prescriber**
(The next question to be answered on the Red Flag Verification tab in NexGen relates to the procedures and information gathered in Step 3 of the validation process)

➤ **Was the patient/prescriber relationship validated? (Yes or No)**
   o *In order for a prescription to be valid, there must be a proper patient-prescriber relationship and the prescription must be written within the prescriber's scope of practice.*
   o *Look for "Red Flags" that MAY indicate that a proper patient-prescriber relationship does not exist such as:*
      ▪ *The prescriber writes for the same or similar medications in the same dosage quantities to most or all of his/her patients (e.g., oxycodone 30mg, 180 dosage units).*
      ▪ *The prescriber routinely prescribes the same "cocktail" or combination of drugs for pain treatment to most or all of his/her patients, particularly where DEA and other authorities have identified the combination as potentially abused (e.g., oxycodone, alprazolam and carisoprodol or any combination of drugs from these three drug classes).*
      ▪ *Prescription is for an excessive quantity.*
      ▪ *It is well known that the prescriber does not take insurance, or the patient has insurance but insists on paying cash for their narcotic prescriptions, especially for high-priced, brand-named drugs.*
      ▪ *Patients from a particular prescriber come to the pharmacy in groups.*
      ▪ *The patient or the prescriber is located outside the pharmacy's typical geographic area (e.g. patient's address is OH, prescriber's address is FL and your pharmacy is located in KY).*
      ▪ *The prescriber writes a prescription for medication outside their normal scope of practice.*
   o *Note: A response of 'no' to this question (meaning the prescription is not written based on a legitimate patient-prescriber relationship or written within the prescriber's scope of practice) will result in an auto fail of the Red Flag Process. Once the Pharmacist acknowledges the rejection of the prescription. it will auto delete and will not be able to be reactivated.*

☐ **Step 4: Validate Patient**
(The next 2 questions to be answered on the Red Flag Verification tab in NexGen relate to the procedures and information gathered in Step 4 of the validation process)

➤ **Was the patient's med history reviewed? (Yes or No)**

#RXO0047-2015
3/10/2015 (updated 1/24/19)

- o *As part of validating the patient, the patient profile should be reviewed to perform a DUR and if they are a Rite Aid patient, to check for the following:*
  - *Multiple prescribers*
  - *Payment trends (e.g. always pays cash for controlled substances, but has insurance)*
  - *Only prescriptions for controlled substances in profile, or only fills for a combination of products commonly known as the "trinity" (oxycodone, alprazolam and carisoprodol or any combination of drugs from these three drug classes).*
  - *Previous fills for current prescription as well as any other controlled substance*
  - *Early refills on controlled substances, where they paid cash stating lost prescription, going away on vacation, etc...*
- o *If for any reason you need to review the patient's profile during the Red Flag documentation process, Alt F9 will display the patient's medication history*
- ➤ **Was the PMP reviewed? (Yes or No)**
  - o *Pharmacists should review the State Prescription Drug Monitoring Program (PMP, PDMP), if the prescription or patient is suspicious.*

☐ **Step 5: Determine, using Professional Judgment, Whether to Dispense or Not to Dispense**
- ➤ If the Red Flag documentation process does not unveil any issues and in the Pharmacist's professional opinion the determination is made to dispense, the QA reviewing Pharmacist, will approve the Red Flag Process biometrically and normal workflow will resume.
- ➤ If the process is rejected either by an auto fail of the Red Flag process or manually if in the Pharmacist's professional opinion the prescription does not meet Rite Aid's requirements, the QA reviewing Pharmacist must select a reason from the drop down menu and biometrically acknowledge the rejection, the rejected prescription will be automatically deleted.
- ➤ The deleted Red Flag controlled prescription information will be saved and displayed with a Red Flag icon in the patient's medication history.

#RXO0047-2015
3/10/2015 (updated 1/24/19)



> These rejected Red Flag prescriptions cannot be deleted/removed from the patient's profile. Once a prescription is flagged it cannot be restarted for any reason.

*Note:* Cancelling out of the Red Flag validation screen prior to saving will result in data being lost. You will be taken back to the QA tab and required to revalidate the prescription again.

> To review the rejection reason(s) for a Red Flag Prescription, click view red flag details.



> If in your professional opinion or due to an auto fail you determine you cannot dispense the prescription, below are examples of how this can be explained to the patient:
>   ○ "I apologize for any inconvenience, but based on Rite Aid's procedure for dispensing certain controlled substances; this prescription does not meet the

#RXO0047-2015
3/10/2015 (updated 1/24/19)

> requirements we have in place for dispensing these medications.  Therefore, we cannot fill this prescription."
>
> o "I apologize for the inconvenience, but I have not been able to successfully validate all required aspects of the prescription, so I am not able to fill it for you."

**Remember ONLY a pharmacist may relay this information to the patient.  This MUST be done in a respectful manner, never accuse the patient or make any unnecessary comments.**

☐ **Step 6: Report Suspicious Activity (if applicable) remains unchanged**

> ➢ Contact local authorities for any prescription that has been confirmed by the prescriber as fraudulent or forged.
>
> ➢ To assist in the effort to curb inappropriate prescribing and/or the spread of prescription drug abuse, Pharmacists should immediately notify their District Leader and submit a ServiceNow ticket (using the below procedures), to communicate their concerns about prescribing patterns, prescribers from areas significantly outside the pharmacy's typical geographic area, or if other pharmacies are refusing to fill prescriptions from a particular prescriber or prescriber group.
>
> ➢ Procedures for submitting the Service Now ticket for concerns surrounding prescribers
>   - o Select Report Technical Issue
>   - o Select Pharmacy Regulatory Compliance
>   - o Enter your five (5) digit store number
>   - o Where this issue occurring
>   - o For Description of Issue, enter the following information:
>     - ▪ Prescriber Name
>     - ▪ Prescriber Address
>     - ▪ Prescriber DEA
>     - ▪ Comments: Enter description of the suspicious activity

☐ Should you have any questions or concerns regarding the Automated Red Flag documentation process, please contact your District Leader.

# EXHIBIT

# "C"

Exhibit "C"

| | | | |
|---|---|---|---|
| **Report Title:** | Incident Details | | |
| **Run Date and Time:** | 2019-01-22 14:41:01 Eastern Standard Time | | |
| **Run By:** | Katharine N Allgood | | |
| **Table name:** | Incident | | |

## Incident

| | | | |
|---|---|---|---|
| Number: | INC1366337 | Opened: | 2019-01-21 15:54:38 |
| Caller: | Kathy K Lee | Opened by: | Kathy K Lee |
| Location: | Rite Aid 06084 | Contact type: | Phone |
| Category: | NexGen | State: | Active |
| Subcategory: | Reporting Suspicious Controlled Substance Prescribing Trend | Sub-Status: | |
| Issue: | | Issue Escalated: | false |
| Configuration Item: | | Assignment group: | Pharmacy Compliance |
| Impact: | 2 - Medium | Assigned to: | Janet M Hart |
| Urgency: | 2 - Medium | Dispatch FTS: | false |
| Priority: | 3 - Moderate | FYI: | false |
| | | FYI User(s): | |

Location Special Conditions:

TC51/MC3300/RF Gun Modernization Pilot

Short description:

Recieved Rx written from Dr Ernest Bonner Jr dr notes states not accepted at walgreens

Description:

Received an Rx written from Dr Ernest Bonner. Prescriber notes states Walgreens does not accept this provider. Upon further investigation, the prescribers phone number is listed under different patient profiles. 916 971 3900, 5108643600, 510 9694166. When we called the first number there was no answering machine or prompts. The person just answers it as "hello". When asked to verify an rx they said no one was in the office until Thursday. The patient wanted to ring the drs cell phone which we could not accept. Is this Dr acceptable to fill for? Unable to verify the dr info

## Notes

Watch list:                                            Work notes list:

Additional comments:

2019-01-22 07:32:24 - Katharine N Allgood (Additional comments)
Thank you for the information. We will begin a review of this prescriber. Please continue to exercise your professional judgement and follow the red flags process. If you have any questions, please follow up with your DL or RHL. Thank you.

Work notes:

2019-01-22 07:32:22 - Katharine N Allgood (Work notes)
Thank you for the information. We will begin a review of this prescriber. Please continue to exercise your professional judgement and follow the red flags process. If you have any questions, please follow up with your DL or RHL. Thank you.

Actions taken:

## Related Records

| | |
|---|---|
| Problem: | Attached KB Article: |
| Parent Incident: | |

## Vendor Details

| |
|---|
| hughes_case_id: |
| hughes_status: |

# EXHIBIT

# "D"

| Prescriber | Product | Quarter | | | | Q1 (Oct 2016 - Dec 2016) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Prod Unit Volume | Prod Rx | Avg Units/Rx Prod | Prod % Of Total Unit Volume | Prod Unit Volume | Prod Rx | Avg Units/Rx Prod | Prod % Of Total Unit Volume |
| BONNER ERNEST | ALPRAZOLAM | 4,075 | 54 | 75.5 | 7.0% | 4,650 | 53 | 87.7 | 8.7% |
| BONNER ERNEST | CARISOPRODOL | 720 | 13 | 55.4 | 1.2% | 330 | 6 | 55.0 | 0.6% |
| BONNER ERNEST | CLONAZEPAM | 1,185 | 15 | 79.0 | 2.0% | 1,390 | 17 | 81.8 | 2.6% |
| BONNER ERNEST | DIAZEPAM | 360 | 8 | 45.0 | 0.6% | 510 | 11 | 46.4 | 1.0% |
| BONNER ERNEST | DLAMPHETAMINE | 210 | 4 | 52.5 | 0.4% | 195 | 4 | 48.8 | 0.4% |
| BONNER ERNEST | FENTANYL | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | HYDROCODONE | 7,548 | 81 | 93.2 | 12.9% | 6,922 | 77 | 89.9 | 13.0% |
| BONNER ERNEST | LISDEXAMFETAMINE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | LORAZEPAM | 46 | 3 | 15.3 | 0.1% | 194 | 7 | 27.7 | 0.4% |
| BONNER ERNEST | LORCASERIN | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | METHADONE | 1,376 | 12 | 114.7 | 2.4% | 1,772 | 12 | 147.7 | 3.3% |
| BONNER ERNEST | METHYLPHENIDATE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | MORPHINE SULF | 420 | 5 | 84.0 | 0.7% | 360 | 5 | 72.0 | 0.7% |
| BONNER ERNEST | OXYCODONE | 5,570 | 68 | 81.9 | 9.5% | 3,970 | 45 | 88.2 | 7.4% |
| BONNER ERNEST | OXYMORPHONE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | PHENDIMETRAZINE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | PHENTERMINE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | ZOLPIDEM | 120 | 6 | 20.0 | 0.2% | 150 | 6 | 25.0 | 0.3% |
| BONNER ERNEST | HYDROMORPHONE | 819 | 6 | 136.5 | 1.4% | 333 | 4 | 83.3 | 0.6% |
| BONNER ERNEST | SUBOXONE | 9,110 | 163 | 55.9 | 15.6% | 8,673 | 186 | 46.6 | 16.3% |
| BONNER ERNEST | TEMAZEPAM | 210 | 7 | 30.0 | 0.4% | 180 | 6 | 30.0 | 0.3% |
| BONNER ERNEST | TRAMADOL | 30 | 1 | 30.0 | 0.1% | 210 | 5 | 42.0 | 0.4% |
| BONNER ERNEST | ALL OTHER | 26,695 | 594 | 44.9 | 45.6% | 23,528 | 483 | 48.7 | 44.1% |

| Prescriber | Product | Quarter | | | | Q3 (Apr 2016 - Jun 2016) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Prod Unit Volume | Prod Rx | Avg Units/Rx Prod | Prod % Of Total Unit Volume | Prod Unit Volume | Prod Rx | Avg Units/Rx Prod | Prod % Of Total Unit Volume |
| BONNER ERNEST | ALPRAZOLAM | 4,929 | 57 | 86.5 | 9.0% | 4,710 | 55 | 85.6 | 13.4% |
| BONNER ERNEST | CARISOPRODOL | 1,455 | 25 | 58.2 | 2.6% | 905 | 19 | 47.6 | 2.6% |
| BONNER ERNEST | CLONAZEPAM | 1,860 | 24 | 77.5 | 3.4% | 1,365 | 16 | 85.3 | 3.9% |
| BONNER ERNEST | DIAZEPAM | 330 | 7 | 47.1 | 0.6% | 394 | 10 | 39.4 | 1.1% |
| BONNER ERNEST | DLAMPHETAMINE | 180 | 3 | 60.0 | 0.3% | 120 | 2 | 60.0 | 0.3% |
| BONNER ERNEST | FENTANYL | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | HYDROCODONE | 4,440 | 49 | 90.6 | 8.1% | 2,705 | 34 | 79.6 | 7.7% |
| BONNER ERNEST | LISDEXAMFETAMINE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | LORAZEPAM | 257 | 7 | 36.7 | 0.5% | 590 | 8 | 73.8 | 1.7% |
| BONNER ERNEST | LORCASERIN | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | METHADONE | 2,090 | 14 | 149.3 | 3.8% | 60 | 1 | 60.0 | 0.2% |
| BONNER ERNEST | METHYLPHENIDATE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | MORPHINE SULF | 330 | 6 | 55.0 | 0.6% | 60 | 1 | 60.0 | 0.2% |
| BONNER ERNEST | OXYCODONE | 7,100 | 78 | 91.0 | 12.9% | 2,400 | 32 | 75.0 | 6.8% |
| BONNER ERNEST | OXYMORPHONE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | PHENDIMETRAZINE | 0 | 0 | | | 0 | 0 | | |
| BONNER ERNEST | PHENTERMINE | 0 | 0 | | | 34 | 1 | 34.0 | 0.1% |
| BONNER ERNEST | ZOLPIDEM | 110 | 5 | 22.0 | 0.2% | 275 | 9 | 30.6 | 0.8% |
| BONNER ERNEST | HYDROMORPHONE | 360 | 4 | 90.0 | 0.7% | 0 | 0 | | |
| BONNER ERNEST | SUBOXONE | 8,837 | 206 | 42.9 | 16.1% | 6,963 | 143 | 48.7 | 19.8% |
| BONNER ERNEST | TEMAZEPAM | 90 | 3 | 30.0 | 0.2% | 90 | 3 | 30.0 | 0.3% |
| BONNER ERNEST | TRAMADOL | 30 | 1 | 30.0 | 0.1% | 580 | 5 | 116.0 | 1.6% |
| BONNER ERNEST | ALL OTHER | 22,581 | 499 | 45.3 | 41.1% | 13,977 | 318 | 44.0 | 39.7% |

030

| Prescriber | Quarter | Q1 (Dec 2018 - Feb 2019) | | | | Q2 (Sep 2018 - Nov 2018) | | | | Q3 (Jun 2018 - Aug 2018) | | | | Q4 (Mar 2018 - May 2018) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Product | Product Unit Volume | Product Rx | Avg Units / Rx | Product % of Total Unit Volume | Product Unit Volume | Product Rx | Avg Units / Rx | Product % of Total Unit Volume | Product Unit Volume | Product Rx | Avg Units / Rx | Product % of Total Unit Volume | Product Unit Volume | Product Rx | Avg Units / Rx | Product % of Total Unit Volume |
| BONNER ERNEST | ALPRAZOLAM | 800 | 13 | 62 | 1.1% | 890 | 15 | 59 | 1.3% | 983 | 17 | 58 | 1.1% | 1,410 | 21 | 67 | 1.2% |
| | CARISOPRODOL | 980 | 15 | 65 | 1.4% | 1,105 | 19 | 58 | 1.6% | 1,310 | 21 | 62 | 1.5% | 2,465 | 35 | 70 | 2.1% |
| | CLONAZEPAM | 1,050 | 11 | 96 | 1.5% | 1,210 | 14 | 86 | 1.7% | 1,830 | 20 | 92 | 2.0% | 1,490 | 15 | 99 | 1.3% |
| | DIAZEPAM | 182 | 7 | 26 | 0.3% | 110 | 5 | 22 | 0.2% | 382 | 13 | 29 | 0.4% | 752 | 17 | 44 | 0.6% |
| | DLAMPHETAMINE | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | | 60 | 1 | 60 | 0.1% |
| | FENTANYL | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | |
| | HYDROCODONE | 9,419 | 96 | 98 | 13.4% | 7,700 | 76 | 101 | 11.1% | 14,637 | 141 | 104 | 16.2% | 18,271 | 174 | 105 | 15.7% |
| | HYDROMORPHONE | 810 | 6 | 135 | 1.2% | 870 | 8 | 109 | 1.3% | 893 | 8 | 112 | 1.0% | 2,547 | 25 | 102 | 2.2% |
| | LISDEXAMFETAMINE | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | |
| | LORAZEPAM | 0 | 0 | | | 200 | 2 | 100 | 0.3% | 260 | 3 | 87 | 0.3% | 395 | 6 | 66 | 0.3% |
| | LORCASERIN | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | |
| | METHADONE | 3,375 | 17 | 199 | 4.8% | 3,715 | 16 | 232 | 5.3% | 4,440 | 25 | 178 | 4.9% | 6,292 | 36 | 175 | 5.4% |
| | METHYLPHENIDATE | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | |
| | MORPHINE SULF | 845 | 13 | 65 | 1.2% | 990 | 15 | 66 | 1.4% | 1,440 | 21 | 69 | 1.6% | 2,115 | 25 | 85 | 1.8% |
| | OXYCODONE | 29,112 | 317 | 92 | 41.5% | 25,700 | 278 | 92 | 36.9% | 30,248 | 324 | 93 | 33.5% | 38,045 | 393 | 97 | 32.7% |
| | OXYMORPHONE | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | | 60 | 1 | 60 | 0.1% |
| | PHENDIMETRAZINE | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | |
| | PHENTERMINE | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | | 0 | 0 | | |
| | SUBOXONE | 8,351 | 145 | 58 | 11.9% | 8,762 | 172 | 51 | 12.6% | 10,835 | 197 | 55 | 12.0% | 10,337 | 180 | 57 | 8.9% |
| | TEMAZEPAM | 90 | 3 | 30 | 0.1% | 90 | 3 | 30 | 0.1% | 110 | 4 | 28 | 0.1% | 158 | 6 | 26 | 0.1% |
| | TRAMADOL | 0 | 0 | | | 290 | 4 | 73 | 0.4% | 190 | 3 | 63 | 0.2% | 60 | 1 | 60 | 0.1% |
| | ZOLPIDEM | 36 | 2 | 18 | 0.1% | 28 | 2 | 14 | 0.0% | 64 | 5 | 13 | 0.1% | 64 | 4 | 16 | 0.1% |
| | ALL OTHER | 15,155 | 279 | 54 | 21.6% | 17,940 | 359 | 50 | 25.8% | 22,555 | 405 | 56 | 25.0% | 31,935 | 550 | 58 | 27.4% |

010

# EXHIBIT

# "E"

Exhibit "E"

# Drug Scheduling

**Drug Schedules**

Drugs, substances, and certain chemicals used to make drugs are classified into five (5) distinct categories or schedules depending upon the drug's acceptable medical use and the drug's abuse or dependency potential. The abuse rate is a determinate factor in the scheduling of the drug; for example, Schedule I drugs have a high potential for abuse and the potential to create severe psychological and/or physical dependence. As the drug schedule changes--Schedule II, Schedule III, etc., so does the abuse potential--Schedule V drugs represents the least potential for abuse. A Listing of drugs and their schedule are located at Controlled Substance Act (CSA) Scheduling or CSA Scheduling by Alphabetical Order. These lists describes the basic or parent chemical and do not necessarily describe the salts, isomers and salts of isomers, esters, ethers and derivatives which may also be classified as controlled substances. These lists are intended as general references and are not comprehensive listings of all controlled substances.

Please note that a substance need not be listed as a controlled substance to be treated as a Schedule I substance for criminal prosecution. A controlled substance analogue is a substance which is intended for human consumption and is structurally or pharmacologically substantially similar to or is represented as being similar to a Schedule I or Schedule II substance and is not an approved medication in the United States. (See 21 U.S.C. §802(32)(A) for the definition of a controlled substance analogue and 21 U.S.C. §813 for the schedule.)

**Schedule I**

Schedule I drugs, substances, or chemicals are defined as drugs with no currently accepted medical use and a high potential for abuse. Some examples of Schedule I drugs are:

heroin, lysergic acid diethylamide (LSD), marijuana (cannabis), 3,4-methylenedioxymethamphetamine (ecstasy), methaqualone, and peyote

**Schedule II**

Schedule II drugs, substances, or chemicals are defined as drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence. These drugs are also considered dangerous. Some examples of Schedule II drugs are:

Combination products with less than 15 milligrams of hydrocodone per dosage unit (Vicodin), cocaine, methamphetamine, methadone, hydromorphone (Dilaudid), meperidine (Demerol), oxycodone (OxyContin), fentanyl, Dexedrine, Adderall, and Ritalin

**Schedule III**

Schedule III drugs, substances, or chemicals are defined as drugs with a moderate to low potential for physical and psychological dependence. Schedule III drugs abuse potential is less than Schedule I and Schedule II drugs but more than Schedule IV. Some examples of Schedule III drugs are:

Products containing less than 90 milligrams of codeine per dosage unit (Tylenol with codeine), ketamine, anabolic steroids, testosterone

**Schedule IV**

Schedule IV drugs, substances, or chemicals are defined as drugs with a low potential for abuse and low risk of dependence. Some examples of Schedule IV drugs are:

Xanax, Soma, Darvon, Darvocet, Valium, Ativan, Talwin, Ambien, Tramadol

**Schedule V**

Schedule V drugs, substances, or chemicals are defined as drugs with lower potential for abuse than Schedule IV and consist of preparations containing limited quantities of certain narcotics. Schedule V drugs are generally used for antidiarrheal, antitussive, and analgesic purposes. Some examples of Schedule V drugs are:

cough preparations with less than 200 milligrams of codeine or per 100 milliliters (Robitussin AC), Lomotil, Motofen, Lyrica, Parepectolin

  

## Who We Are </who-we-are>

Contact Us </who-we-are/contact-us>

DEA Museum <https://www.deamuseum.org/>

## What We Do </what-we-do>

Education & Prevention </what-we-do/education-and-prevention>

Law Enforcement </law-enforcement>

News </news>

## Resources </resources>

Drug Information </drug-information>

Employee Assistance Program </resources/eap>

Equal Opportunity Employer </how-to-apply/equal-opportunity-employer>

Publications

Media Galleries </resprces/media-galleries>

VWAP <https://www.dea.gov/resources/vwap>

## Doing Business with the DEA </resources/doing-business-dea>

Overview </resources/doing-business-dea>

Current Vendors </doing-business-dea/current-vendors>

Prospective Vendors </doing-business-dea/prospective-vendors>

Security Clauses </doing-business/security-clauses>

Security Forms </doing-business-dea/security-forms>

Small Business Program </doing-business-dea/small-business>

## Policies <>

Accessibility, Plug-ins & Policy </resources/accessibility-plug-ins-policy>

Legal Policies & Disclaimers <https://www.justice.gov/legalpolicies>

No FEAR Act <https://www.justice.gov/jmd/eeo-program-status-report>

Privacy Policy <https://www.justice.gov/doj/privacy-policy>

U.S. Department of Justice EE <https://www.justice.gov/jmd/file/7900

USA.gov <https://www.usa.gov/>

Whistleblower Protection <https://www.justice.gov/pardon/whist protection-enhancement-act>



### United States Drug Enforcement Administration

DEA.gov is an official site of the U.S. Department of Justice <https://www.justice.gov/>

<https:/ <https:/ <https:/ <https:/ /www.f /www.t /www.li /www.i aceboo witter.c nkedin. nstagra

### DEA Contact Center

(202) 307-1000 info@dea.gov
Contact the Webmaster </contact-us>

# EXHIBIT

# "F"

Exhibit "F"

Department of Justice/Drug Enforcement Administration
# Drug Fact Sheet

# Oxycodone

## WHAT IS OXYCODONE?

Oxycodone is a semi-synthetic narcotic analgesic and historically has been a popular drug of abuse among the narcotic abusing population.

## WHAT IS ITS ORIGIN?

Oxycodone is synthesized from thebaine, a constituent of the poppy plant.

## What are common street names?

Common street names include:
- Hillbilly Heroin, Kicker, OC, Ox, Roxy, Perc, and Oxy

## What does it look like?

Oxycodone is marketed alone as OxyContin® in 10, 20, 40 and 80 mg extended-release tablets and other immediate-release capsules like 5 mg OxyIR®. It is also marketed in combination products with aspirin such as Percodan® or acetaminophen such as Roxicet®.

## How is it abused?

Oxycodone is abused orally or intravenously. The tablets are crushed and sniffed or dissolved in water and injected. Others heat a tablet that has been placed on a piece of foil then inhale the vapors.

## What is its effect on the mind?

Euphoria and feelings of relaxation are the most common effects of oxycodone on the brain, which explains its high potential for abuse.

## What is its effect on the body?

Physiological effects of oxycodone include:
- Pain relief, sedation, respiratory depression, constipation, papillary constriction, and cough suppression. Extended or chronic use of oxycodone containing acetaminophen may cause severe liver damage

## What are its overdose effects?

Overdose effects include:
- Extreme drowsiness, muscle weakness, confusion, cold and clammy skin, pinpoint pupils, shallow breathing, slow heart rate, fainting, coma, and possible death

## Which drugs cause similar effects?

Drugs that cause similar effects to Oxycodone include:
- Opium, codeine, heroin, methadone, hydrocodone, fentanyl, and morphine

## What is its legal status in the United States?

Oxycodone products are in Schedule II of the Controlled Substances Act.



Oxycodone pills



# EXHIBIT

# "G"

Exhibit "G"

Rx Image

| Rx Label Info | |
|---|---|
| Store #: | 05996 |
| DOS : | 02/18/2019 |
| Rx #: | 1843891 |
| Str DEA #: | BT5235076 |
| QA-RPH: | RXPSSC1 |
| Cust Name: | CONRAD, STACEY |
| Cust Addr: | 25200 SANTA CLARA ST APT 225 HAYWARD, CA 94544-2103 |
| Cust DOB | 10/12/1968 |
| MD Name: | BONNER, ERNEST L |
| MD DEA: | BB2779520 |
| MD Addr: | 433 ESTUDILLO AVE STE 206 SAN LEANDRO, CA 94577-0000 |
| Drug: | OXYCODONE HCL 30 MG TABLET |
| Mft.: | MALLINCKRODT PH |
| Distrib.: | MALLINCKRODT PH |
| NDC: | 00406-8530-01 |
| DAW: | 0 |
| Quantity: | 90.0 |
| Quantity Dispensed: | 90.0 |
| Quantity Owed: | 0.0 |
| Days Supply: | 22.0 |
| Type: | NEW |

Conrad , Stacey

3537 Sierra Madre Ave   Stockton



| | |
|---|---|
| Store #: | 06054 |
| DOS : | 01/25/2019 |
| Rx #: | 1506696 |
| Str DEA #: | BT5237741 |
| QA-RPH: | RXPTP7 |
| Cust Name: | WALTON, KENNETH |
| Cust Addr: | 3634 BILLENGER CT B SACRAMENTO, CA 95660-0000 |
| Cust DOB | 06/30/1988 |
| MD Name: | BONNER, ERNEST L |
| MD DEA: | BB2779520 |
| MD Addr: | 2929 EL CAMINO AVE SACRAMENTO, CA 95821-4215 |
| Drug: | OXYCODONE HCL 30 MG TABLET |
| Mft.: | MALLINCKRODT PH |
| Distrib.: | MALLINCKRODT PH |
| NDC: | 00406-8530-01 |
| DAW: | 0 |
| Quantity: | 100.0 |
| Quantity Dispensed: | 100.0 |
| Quantity Owed: | 0.0 |
| Days Supply: | 25.0 |
| Type: | NEW |

| | |
|---|---|
| User ID: RXPTP7   Date/Time: 1/25/2019 1:12:18 PM   Subject: LAST EXCEPTION ON TX PLAN PT AWARED | |
| User ID: RXPTP7   Date/Time: 1/25/2019 1:12:18 PM   Subject: SERIAL # INFORMED MD | |

Rx Image

| | |
|---|---|
| Store #: | 06054 |
| DOS : | 02/23/2019 |
| Rx #: | 1512456 |
| Str DEA #: | BT5237741 |
| QA-RPH: | RXPSHD1 |
| Cust Name: | WALTON, KENNETH |
| Cust Addr: | 3634 BILLENGER CT B SACRAMENTO, CA 95660-0000 |
| Cust DOB | 06/30/1988 |
| MD Name: | BONNER, ERNEST L |
| MD DEA: | BB2779520 |
| MD Addr: | 2929 EL CAMINO AVE SACRAMENTO, CA 95821-4215 |
| Drug: | OXYCODONE HCL 30 MG TABLET |
| Mft.: | MALLINCKRODT PH |
| Distrib.: | MALLINCKRODT PH |
| NDC: | 00406-8530-01 |
| DAW: | 0 |
| Quantity: | 100.0 |
| Quantity Dispensed: | 100.0 |
| Quantity Owed: | 0.0 |
| Days Supply: | 25.0 |
| Type: | NEW |

Walton Jr  Kenneth

3634 Bellinger Ct , North Highlands,

# EXHIBIT

# "H"

Exhibit "H"























# EXHIBIT

# "I"

**Evie J. M** RITE AID PHARMACY

MAILING ADDRESS
P.O. Box 3165
Harrisburg, PA 17105

| | |
|---|---|
| From: | Christopher A. Morris |
| Sent: | Thursday, February 28, 2019 2:28 PM |
| To: | Evie J. Mcclane; Robert M. Butler |
| Cc: | Harmony Aker; Sanjay Rayathatha; Janet M Hart; Amanda Glover; Brandan D. Mehaffie |
| Subject: | RE: Clinic Protocol Request |
| Attachments: | Sacramento Office 1.jpg; Sacramento Office 2.jpg; Sacramento Office 3.jpg; Sacramento Office 4.jpg; Sacramento Office 5.jpg; Sacramento Office 6.jpg; Sacramento Office 7.jpg; Sacramento Office 8.jpg; Sacramento Office 9.jpg; Sacramento Office 10.jpg; Sacramento Office 11.jpg |

GENERAL OFFICE
30 Hunter Lane
Camp Hill, PA 17011
717.761.2633

**Importance:** High

Good day Evie,

Rob and I arrived at the facility today at 9:15 am and departed at approx. 9:55 am. Please note the observations below:

- The "office park" appeared to consist of one main building with a couple of different unmarked doors
- There was only one car we observed parked in the parking area
- No cars were observed coming or going
- No out-of-state license plates were observed anywhere in the plaza
- The was not a physician's name on the placard outside of the office nor was there any type of clinic name on the door
- The mailbox in front of what we presumed to be the office door was missing the two "9's" of the street address
- Street numbers were missing from the signage on the corner of the building
- All doors and windows (aside from the presumed office door were covered in what appeared to be black trash bags
- One door was ajar, appearing to be without a lock. I opened it to find a vacant hallway
- There were multiple signs placed on side windows and the rear of the building stating that the building was condemned
- No signs indicated heightened security
- Please see the attached 11 pictures

If you have any questions or require clarification please feel free to reach out to me.

Thank you,

Chris Morris
Asset Protection District Leader
(916) 852-1439 x235 Office
(916) 852-1736 Fax

SEE "Something"
SAY "Something"         Hotline: 888-748-3225

1

# EXHIBIT

# "J"

Exhibit "J"



MAILING ADDRESS
P.O. Box 3165
Harrisburg, PA 17105

GENERAL OFFICE
30 Hunter Lane
Camp Hill, PA 17011

717.761.2633

Dr. Ernest L. Bonner                                                    April 1, 2019
433 Estudillo Ave. Ste. 206
San Leandro, CA 94577
DEA Registration: BB2779520

Dear Dr. Bonner,

        This is to notify you that our pharmacy locations will no longer fill prescriptions from your office
for Schedule II, III, IV and V controlled substances effective April 15, 2019. Rite Aid has taken this
action because of our concern about increased reports of controlled substance prescription drug abuse,
especially Oxycodone. Rite Aid and our pharmacists have a responsibility to take appropriate steps to
reduce the potential that drugs we dispense are not diverted or abused.

        We regret any inconvenience that this action may cause. However, Rite Aid is committed to
reducing the potential for diversion and abuse of controlled substances and finds it necessary to take this
action at this time. If you have any questions regarding this matter, you may direct those questions to
Janet Hart, Director, Government Affairs at Jhart@riteaid.com or (717) 975-5758

                                                Sincerely,
                                                Rite Aid

                                                Janet G. Hart R.Ph.
                                                Director, Government Affairs

CC: Karla Palmer, Esquire, Hyman, Phelps and McNamara PC

1

# DECLARATION OF SERVICE

2

3

*Bonner v. Rite Aid, et al.*
*U.S. District Court, Eastern District Case No. 2:19−CV−00674−MCE−JDP*

4

5

     I am employed in Los Angeles County; I am over the age of eighteen years and not a party to the within action; my business address is 11755 Wilshire Blvd., 15th Floor, Los Angeles, California 90025.

6

7

8

     On September 26, 2022, I served the foregoing document   described as **DECLARATION OF JANET HART IN SUPPORT OF DEFENDANT THRIFTY PAYLESS INC., dba RITE AID PHARMACY'S MOTION FOR SUMMARY JUDGMENT / ADJUDICATION OF ISSUES** on the interested parties in this action as follows:

9

10

11

12

13

*Attorney for Plaintiff*
Gary Sherrer, Esq. (S.B. #113047)
LAW OFFICE OF GARY SHERRER
875-A Island Drive #403
Alameda, CA  94502-6751
T: (510) 421-2838
F: (510) 217-3930
E: sherrlaw@aol.com
ebonnermd@gmail.com

14

15

16

17

   **By United States Postal Service.**  I enclosed the documents in a sealed envelope or package with postage fully prepaid, addressed to each party at their address of record (listed herein) and placed the envelope for collection and depositing with the United States Postal Service on this same date in accordance with ordinary business practices.  The envelope or package was placed in the mail in Sacramento, California.

18

19

20

   ✔ **By E-Mail or Electronic Transmission.**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to each party at their e-mail addresses of record (listed herein).  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

21

22

     I am aware that on motion of a party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing as stated on this declaration.

23

24

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on September 26, 2022, at Los Angeles, California.

25

26

27

Brandee Wood

28

DECLARATION OF JANET HART IN SUPPORT OF DEFENDANT THRIFTY PAYLESS INC., dba RITE AID
PHARMACY'S MOTION FOR SUMMARY JUDGMENT / ADJUDICATION OF ISSUES