UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST L. BONNER, JR., M.D., | No.  2:19-cv-00674-MCE-JDP |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| RITE AID CORPORATION, and DOES 1 through 50, | |
| Defendants. | |

On April 22, 2019, Plaintiff Ernest L. Bonner, Jr., M.D. ("Plaintiff") initiated the present action against Defendant Thrifty Payless, Inc., doing business as Rite Aid (erroneously sued as Rite Aid Corporation) ("Defendant" or "Rite Aid"), pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332.  Presently before the Court is Defendant's Motion for Summary Judgment or, alternatively, Adjudication of Issues, which has been fully briefed.  ECF Nos. 66 ("Def.'s Mot."), 69 ("Pl.'s Opp'n"), 71.  For the reasons set forth below, Defendant's Motion is GRANTED.[1]

///

///

---

[1] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Local Rule 230(g).

1

1

**BACKGROUND**

2

3  **A. Factual Background**[2]

4    **1. Defendant's Policies and Procedures**

5    In March 2013, Defendant's Regulatory Compliance Department created a panel

6 as part of an investigation/review program to ensure compliance with the U.S. Drug

7 Enforcement Administration ("DEA"), title 21 of the Code of Federal Regulations, and the

8 Federal Controlled Substances Act, "wherein pharmacies are required to monitor the

9 dispensing of controlled substances, reduce the potential risk of abuse, and minimize

10 dependence liability."  Hart Decl., ECF No. 66-4 ¶ 5.  As such, the panel "reviews

11 investigation files and determines whether any remedial measures need to be taken."  Id.

12 In addition, Defendant also provides its own policies and guidelines to its employees

13 regarding similar concerns.  Id. ¶ 6.  Among these policies are Defendant's "Procedures

14 for Validation and Dispensing of High Alert Controlled Substances," and "NexGen

15 Automated Red Flag Documentation Process for High Alert Controlled Substances,"

16 both of which require pharmacists to perform their due diligence in validating the

17 legitimacy of prescriptions for controlled substances.  See Exs. A–B, Hart Decl., ECF

18 No. 66-4, at 8–22.

19    Defendant provides a six-step procedure for validating and dispensing controlled

20 substances, and if a prescription cannot be filled, pharmacists are instructed to "relay

21 this information to the patient" which "MUST be done in a respectful manner, [and the

22 pharmacist must] never accuse the patient or make unnecessary comments."  See Hart

23 Decl., ECF No. 66-4 ¶¶ 8–9 (alterations in original).  If there is suspicious activity,

24 Defendant's policies instruct pharmacists to fill out a "Service Now ticket," in which "they

25 enter their five (5) digit store number, where the issue occurred, and a description

26 ///

27     [2] Unless otherwise noted, the following relevant and undisputed facts are taken, primarily
verbatim, from Defendant's Separate Statement of Undisputed Material Facts and Plaintiff's Response

28 thereto.  ECF Nos. 66-3, 69-2.

1    (i.e. prescriber name, prescriber address, prescriber DEA, and description of the

2    suspicious activity)."  Id. ¶ 10.

3         Defendant's investigation/review program consists of the following four steps:

4         A.  Step 1:  A "suspicious subscriber ticket" is submitted by a
5             pharmacist at a Rite Aid location;

6         B.  Step 2:  The ticket, along with analytics (e.g. data received
             from a compilation of various pharmacies nationwide) is
7             reviewed according to Rite Aid's policies;

8         C.  Step 3:  If there is evidence of possible suspicious activity,
             then clinical protocol will be initiated, and an investigation of
9             the prescriber will proceed.

10        D.  Step 4:  The analytics and results from the investigation will
             then be reviewed by an investigation/review panel.

11   Id. ¶ 11.  "If a decision is made to discontinue filling controlled substance prescriptions

12   from a particular prescriber, the prescriber will be given written notice of the decision."

13   Id. ¶ 12.  According to Defendant, such a decision is not permanent, and the "prescriber

14   may contact Rite Aid and request that their case be revisited.  Rite Aid will then continue

15   to monitor the prescriber and may reinstate the prescriber as early as 6 months to

16   1 year."  Id. ¶ 13.

17                    **2.    Defendant's Actions Toward Plaintiff**

18        On January 22, 2019, a suspicious subscriber ticket was opened by one of

19   Defendant's pharmacists at a Rite Aid store located in Sacramento, California.  The

20   subscriber ticket provided the following description:

21        Received a[] [prescription] written from [Plaintiff].  Prescriber
         notes state[] Walgreens does not accept this provider.  Upon
22        further investigation, the prescriber[']s phone number is listed
         under different patient profiles.  [Phone numbers omitted]
23        When we called the first number there was no answering
         machine or prompts.  The person just answers it as "hello".
24        When asked to verify a[] [prescription] they said no one was in
         the office until Thursday.  The patient wanted to ring [Plaintiff's]
25        cell phone which we could not accept.  Is this [doctor]
         acceptable to fill for?  Unable to verify the [doctor's] info[.]
26

27   Ex. C, Hart Decl., ECF No. 66-4, at 24.  This subscriber ticket was given to Janet Hart,

28   Defendant's Director of the Government Affairs and Regulatory Affairs divisions, who

1  then proceeded to review the analytics for Plaintiff.  Hart Decl., ECF No. 66-4 ¶¶ 4–5, 15.

2  According to Ms. Hart,

3          [t]he analytics for [Plaintiff] showed that his prescriptions from
         all pharmacies (e.g. Rite Aid, Walgreens, CVS) for non-
4         controlled substances had decreased from 45% in 2016 to
         21% in 2019 (i.e. prescriptions for controlled substances
5         increased from 55% to 79%) . . . Oxycodone (a semi-synthetic
         opioid drug prescribed for pain), in particular, comprised of
6         41.5% of his overall prescribed medications [between
         December 2018 and February 2019].
7

8  Id. ¶ 16; see also Ex. D, Hart Decl., ECF No. 66-4, at 26–27 (analytics for Plaintiff); but

9  see Pl.'s Opp'n, at 11 ("Those charts confirm[] that Plaintiff['s] patient load had increased

10  significantly by March, 2018. . . .  Defendant's charts confirm a 35% reduction of the

11  opiate Pain medication, a 49% reduction of Benzodiazepines (i.e. Alprazolam,

12  Diazepam), and also 52% reduction of non-scheduled medication between March 2018

13  and February 2019.").  Based on a review of the analytics and the subscriber ticket,

14  Defendant initiated clinic protocol and commenced an investigation of Plaintiff.  Hart

15  Decl., ECF No. 66-4 ¶ 16.

16          On March 29, 2019, the investigation/review panel, which Ms. Hart is a part of,

17  reviewed a number of prescribers and unanimously decided to discontinue filling

18  prescriptions for controlled substances written by thirteen prescribers, including Plaintiff.

19  But see Pl.'s Statement of Disputed Facts, ECF No. 69-2, at 5 ¶ 17 (disputing on

20  grounds that "there is no evidence provided as to whom the 13 prescribers were or

21  whether there were 12 other prescriber[s] that were Black listed by Rite Aid.").

22  According to Ms. Hart, the decision to discontinue filling Plaintiff's prescriptions for

23  controlled substances was based, in part, on Plaintiff's high and increased number of

24  prescriptions for controlled substances, and that 41.5% of Plaintiff's overall prescriptions

25  were for Oxycodone.  See Hart Decl., ECF No. 66-4 ¶ 18.

26          On April 1, 2019, Defendant sent Plaintiff a letter which stated the following:

27          This is to notify you that our pharmacy locations will no longer
         fill prescriptions from your office for Schedule II, III, IV and V
28         controlled substances effective April 15, 2019.  Rite Aid has

4

1
2
3

> taken this action because of our concern about increased reports of controlled substance prescription drug abuse, especially Oxycodone. Rite Aid and our pharmacists have a responsibility to take appropriate steps to reduce the potential that drugs we dispense are not diverted or abused.

4
5
6
7

> We regret any inconvenience that this action may cause. However, Rite Aid is committed to reducing the potential for diversion and abuse of controlled substances and finds it necessary to take this action at this time. If you have any questions regarding this matter, you may direct those questions to Janet Hart, Government Affairs at [contact information omitted.]

8   Ex. J, Hart Decl., ECF No. 66-4, at 52. Ms. Hart states in her declaration that to date,

9   Plaintiff "has never made a request regarding his case reevaluation or revisitation." Hart

10  Decl., ECF No. 66-4 ¶ 22. However, Plaintiff states that he "was never informed that he

11  could challenge[]" this decision or that this decision was not permanent. See Pl.'s

12  Statement of Disputed Facts, ECF No. 69-2, at 7 ¶¶ 27–28.

13  ### 3. Effect on Plaintiff's Patients

14      In response to Defendant's Special Interrogatories, Set One, Plaintiff identified, in

15  part, four patients as witnesses and they were subsequently deposed. See Ex. G,

16  Maxwell Decl., ECF No. 66-5, at 81–87. The Court will recount their deposition

17  testimonies below.

18
19  ### a. Cecelia Burke

20      In 2019, Ms. Burke attempted to fill her Oxycodone prescription written by Plaintiff

21  at one of Defendant's pharmacies in Castro Valley, California. See Ex. H, Burke Dep.,

22  ECF No. 66-5, at 91–92. However, Ms. Burke was told that Defendant "can't fill this

23  prescription, and [she] said okay." Id. at 92–93 (unable to remember who she spoke to).

24  She could not recall any one at the pharmacy giving her a specific reason behind the

25  refusal, only that the conversation was very brief and she did not ask any follow-up

26  questions. Id. at 93. Ms. Burke was able to fill the prescription at another pharmacy. Id.

27      Additionally, Ms. Burke testified that she was no longer Plaintiff's patient but

28  confirmed that Defendant's refusal to fill her prescription was not a reason behind her

1   decision to leave Plaintiff.  See id. at 94.  When asked why she left, Ms. Burke stated:

2   "You know, I'd really rather not get into that if that's possible.  Um, having to wait hours

3   and hours and hours and hours for an appointment became very frustrating to me."  Id.

4   at 96–97.

5

6                      **b.       Margaret Fenton**

7           On April 12, 2019, Defendant filled Ms. Fenton's prescription for Buprenorphine,

8   which was written by Plaintiff.  See Ex. I, Fenton Dep., ECF No. 66-5, at 102.  A few

9   days later, on April 17, 2019, Ms. Fenton dropped off another prescription written by

10  Plaintiff at one of Defendant's pharmacies.  Id. at 103.  Ms. Fenton subsequently

11  received a phone call, possibly from a pharmacy technician, informing her that

12  Defendant was unable to fill the prescription "because their company policy was to not fill

13  prescriptions from" Plaintiff.  Id. at 103–04.  When Ms. Fenton asked why this happened,

14  the employee said that "she didn't know" and "could only tell [her] it was company policy

15  to no longer fill any prescriptions from" Plaintiff.  Id. at 104–05.  Ms. Fenton then tried to

16  have the prescription filled at CVS Pharmacy, who also refused to fill it but did not give a

17  reason.  Id. at 107–08.  In the end, Ms. Fenton was able to get the prescription filled at

18  Walgreen's.  Id. at 106.  At the time of her deposition, Ms. Fenton was still Plaintiff's

19  patient.  Id. at 111.

20

21                      **c.       Reginald Smith**

22          On February 28, 2019, Mr. Smith attempted to fill an Oxycodone prescription

23  written by Plaintiff at one of Defendant's pharmacies located in Sacramento, California.

24  See Ex. J, Smith Dep., ECF No. 66-5, at 114–15.  According to Mr. Smith, the

25  pharmacist told Plaintiff over the phone that Mr. Smith "should be on a higher dosage

26  and more expensive medications," that "the prescription wasn't written correctly and

27  professionally," and that "Mr. Smith [was] paying with cash, [which] was a red flag."

28  ///

1  Id. at 115.  Ultimately, the pharmacist told Mr. Smith that they were not going to fill the
2  prescription.  Id. at 117.

3      The following day, on March 1, 2019, Mr. Smith tried to have the same
4  prescription filled at another one of Defendant's pharmacies in Vallejo, California.  See
5  id. at 118.  However, that pharmacy also refused to fill the prescription, indicating that
6  the dosage amount was incorrect.  See id. at 119 (testifying that the pharmacist told him
7  "[t]hat if [Plaintiff] would write it for a higher amount, he would fill it.").  Mr. Smith
8  eventually had the prescription filled at a CVS Pharmacy.  Id. at 120.  At the time of his
9  deposition, Mr. Smith was still a patient of Plaintiff.  Id. at 114.

10
11                    d.      Waheed Guirgis

12      Sometime in 2018 or 2019, Mr. Guirgis tried to have an Oxycodone prescription
13  written by Plaintiff filled at one of Defendant's pharmacies in Sacramento, California.
14  See Ex. K, Guirgis Dep., ECF No. 66-5, at 123–24.  However, a pharmacy technician
15  told him that Plaintiff "has been flagged in [their] system and [they are] no longer filling
16  prescriptions for him."  Id. at 124.  No further details were given, and Mr. Guirgis did not
17  ask any follow-up questions.  See id. at 125–26.  Mr. Guirgis informed Plaintiff of what
18  happened, and Plaintiff told him to "find another pharmacy."  Id. at 127.  Ultimately, Mr.
19  Guirgis was able to have his prescription (and subsequent prescriptions written by
20  Plaintiff) filled at other pharmacies.  See id. at 127, 131.  At the time of his deposition,
21  Mr. Guirgis was still Plaintiff's patient.  Id. at 132.

22      **B.    Procedural History**

23      Plaintiff filed his original Complaint in this Court on April 22, 2019, which asserted
24  the following causes of action against Defendant:  (1) Unfair Competition in violation of
25  California Business and Professions Code §§ 17200 et seq. ("UCL"); (2) Intentional
26  Interference with Prospective Economic Advantage ("IIPEA"); (3) Negligent Interference
27  with Prospective Economic Advantage ("NIPEA"); (4) Defamation; (5) Intentional
28  Infliction of Emotional Distress ("IIED"); (6) violation of 42 U.S.C. § 1981 ("§ 1981"); and

1  (7) violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  ECF No. 1.  In

2  response to Defendant's first motions to dismiss and strike, Plaintiff filed a First

3  Amended Complaint on June 20, 2019, which alleged the same causes of action listed

4  above.  ECF Nos. 4, 5, 9.  Defendant subsequently moved to dismiss Plaintiff's IIED,

5  § 1981, and Title VII causes of action and moved to dismiss and strike Plaintiff's claims

6  for restitution and punitive damages on July 5, 2019.  ECF Nos. 11, 12.  On February 18,

7  2020, the Court granted the motion to dismiss the IIED and § 1981 claims with leave to

8  amend, granted the motion to dismiss the Title VII claim without leave to amend, and

9  denied the motion to strike as moot.  See ECF No. 22.

10      Plaintiff filed the operative Second Amended Complaint ("SAC") on March 9,

11  2020.  ECF No. 23.  Defendant again moved to dismiss the IIED and § 1981 causes of

12  action and moved to dismiss and strike the requests for restitution and punitive

13  damages.  ECF Nos. 24, 25.  On June 1, 2020, the Court granted Defendant's motion to

14  dismiss in its entirety without leave to amend, denied the motion to strike as moot, and

15  stated that the case shall proceed on the UCL, IIPEA, NIPEA, and Defamation causes of

16  action.  See ECF No. 44.  Defendant subsequently filed its Answer on June 5, 2020.

17  ECF No. 45.

18

19                              **STANDARD**[3]

20

21      The Federal Rules of Civil Procedure provide for summary judgment when "the

22  movant shows that there is no genuine dispute as to any material fact and the movant is

23  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

24  _____

25      [3] Defendant cites the California summary judgment standard in its pleadings.  See Def.'s Mot. at 7.
    Plaintiff also cites California law and rules of court in arguing that Defendant's moving papers are
26  defective.  See Pl.'s Opp'n, at 5–8.  "[U]nder the Erie doctrine, federal law governs the procedural aspects
    of summary judgment in a diversity case, while the law of the forum controls the substantive issues."
27  Caesar Elec. Inc. v. Andrews, 905 F.2d 287, 289 n.3 (9th Cir. 1990); see Erie R.R. Co. v. Tompkins, 304
    U.S. 64, 78 (1938).  Accordingly, the Court applies the federal summary judgment standard set forth in
28  Federal Rule of Civil Procedure 56.  Furthermore, all references to "Rule" or "Rules" are to the Federal
    Rules of Civil Procedure.

1  <u>Catrett</u>, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

2  dispose of factually unsupported claims or defenses.  <u>Celotex</u>, 477 U.S. at 325.

3      Rule 56 also allows a court to grant summary judgment on part of a claim or

4  defense, known as partial summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a) ("A party may

5  move for summary judgment, identifying each claim or defense—or the part of each

6  claim or defense—on which summary judgment is sought.");  <u>see</u> <u>also</u> <u>Allstate Ins. Co. v.</u>

7  <u>Madan</u>, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a

8  motion for partial summary judgment is the same as that which applies to a motion for

9  summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a);  <u>State of Cal. ex rel. Cal. Dep't of Toxic</u>

10  <u>Substances Control v. Campbell</u>, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

11  judgment standard to motion for summary adjudication).

12      In a summary judgment motion, the moving party always bears the initial

13  responsibility of informing the court of the basis for the motion and identifying the

14  portions in the record "which it believes demonstrate the absence of a genuine issue of

15  material fact."  <u>Celotex</u>, 477 U.S. at 323.  If the moving party meets its initial

16  responsibility, the burden then shifts to the opposing party to establish that a genuine

17  issue as to any material fact actually does exist.  <u>Matsushita Elec. Indus. Co., Ltd. v.</u>

18  <u>Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986);  <u>First Nat'l Bank v. Cities Serv. Co.</u>,

19  391 U.S. 253, 288–89 (1968).

20      In attempting to establish the existence or non-existence of a genuine factual

21  dispute, the party must support its assertion by "citing to particular parts of materials in

22  the record, including depositions, documents, electronically stored information,

23  affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

24  not establish the absence or presence of a genuine dispute, or that an adverse party

25  cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

26  opposing party must demonstrate that the fact in contention is material, i.e., a fact that

27  might affect the outcome of the suit under the governing law.  <u>Anderson v. Liberty Lobby,</u>

28  <u>Inc.</u>, 477 U.S. 242, 248, 251–52 (1986);  <u>Owens v. Local No. 169, Assoc. of W. Pulp and</u>

1  Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also

2  demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

3  such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

4  477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

5  before the evidence is left to the jury of "not whether there is literally no evidence, but

6  whether there is any upon which a jury could properly proceed to find a verdict for the

7  party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

8  (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

9  As the Supreme Court explained, "[w]hen the moving party has carried its burden under

10  Rule [56(a)], its opponent must do more than simply show that there is some

11  metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore,

12  "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

13  non-moving party, there is no 'genuine issue for trial.'"  Id. at 587.

14      In resolving a summary judgment motion, the evidence of the opposing party is to

15  be believed, and all reasonable inferences that may be drawn from the facts placed

16  before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

17  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

18  obligation to produce a factual predicate from which the inference may be drawn.

19  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd,

20  810 F.2d 898 (9th Cir. 1987).

21

22                              **ANALYSIS**

23

24      **A.    First Claim for Relief:  Unfair Competition**

25      The UCL defines "unfair competition" as "any unlawful, unfair or fraudulent

26  business act or practice and unfair, deceptive, untrue or misleading advertising . . ."  Cal.

27  Bus. & Prof. Code § 17200; see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,

28  20 Cal. 4th 163, 180 (1999) (stating that there are three separate varieties of unfair

1   competition:  acts or practices which are unlawful, or unfair, or fraudulent).  "To have

2   standing under California's UCL, . . . plaintiffs must establish that they (1) suffered an

3   injury in fact and (2) lost money or property as a result of the unfair competition."

4   Birdsong v. Apple, Inc., 590 F.3d 955, 959 (9th Cir. 2009) (citing Cal. Bus. & Prof. Code

5   § 17204).  In other words, the injury must be economic in nature.  See Mastel v. Miniclip

6   SA, 549 F. Supp. 3d 1129, 1144 (E.D. Cal. 2021).

7          In his declaration, Plaintiff states that he has "suffered emotional and financial

8   harm at the hands of [Defendant's] pharmacies because [he] chose to reduce the

9   amount of all medications prescribed by [him] to the minimal effective dose of medicine

10  for the treatment of [his] patients."  Pl.'s Decl., ECF No. 69-1 ¶ 27.  However, he does

11  not specify what financial harm he suffered.

12         Indeed, Plaintiff claims only that "he has had patients leave his practice and it is

13  untold how many patients have failed to come to his practice because of the taint on his

14  reputation because of Defendant's actions."  Pl.'s Opp'n, at 15.  However, four witnesses

15  testified at their depositions that they were eventually able to fill their prescriptions

16  despite Defendant's refusal and three witnesses were still patients of Plaintiff.  See Ex. I,

17  Fenton Dep., ECF No. 66-5, at 111; Ex. J, Smith Dep., id., at 114; Ex. K, Guirgis Dep.,

18  id., at 132.  The one witness, Ms. Burke, who testified that she was no longer Plaintiff's

19  patient, did not say or suggest that she left Plaintiff's practice because of Defendant's

20  actions; in fact, she confirmed that Defendant's refusal to fill her prescription was not the

21  reason for leaving Plaintiff.  See Ex. H, Burke Dep., id., at 94, 96–97.  Accordingly, there

22  is nothing in the present evidentiary record to show that Plaintiff suffered any economic

23  injury as a result of Defendant's refusal to fill prescriptions written by Plaintiff.  Instead of

24  providing any evidence to the contrary, Plaintiff simply states that "[f]urther discovery will

25  disclose what patients have left [] Plaintiff's practice to go to other physicians whom

26  Defendant Rite Aid will fill the prescriptions for," and "what patients have left [] Plaintiff's

27  practice since April 1, 2019."  Pl.'s Statement of Disputed Facts, ECF No. 69-2,

28  ///

1    at 8–9 ¶¶ 32–33.  What Plaintiff has not explained is what further discovery is needed or

2    why he has not been able to obtain or present such evidence after four years of

3    litigation.

4           Because Plaintiff cannot demonstrate that he suffered an injury-in-fact, he does

5    not have standing to pursue his UCL claim.  Therefore, Defendant's Motion is GRANTED

6    as to this claim.

7           **B.     Second and Third Claims for Relief:  IIPEA and NIPEA**

8           To make a prima facie case of IIPEA, a plaintiff must demonstrate:

9                        (1) an economic relationship between the plaintiff and some
                      third party, with the probability of future economic benefit to the
10                    plaintiff;  (2)  the  defendant's  knowledge  of  the  relationship;
                      (3) intentional acts on the part of the defendant designed to
11                    disrupt the relationship; (4) actual disruption of the relationship;
                      and (5) economic harm to the plaintiff proximately caused by
12                    the acts of the defendant.

13   Youst v. Longo, 43 Cal. 3d 64, 71 n.6 (1987).  The tort of NIPEA differs in that the

14   defendant's conduct does not need to be intentional.  Venhaus v. Shultz, 155 Cal. App.

15   4th 1072, 1078 (2007).

16          Like his UCL claim above, Plaintiff cannot show that he has suffered economic

17   harm.  Plaintiff again asserts that he has lost patients resulting from Defendant's actions,

18   including Ms. Burke.  See Pl.'s Opp'n, at 16; Pl.'s Statement of Disputed Facts, ECF

19   No. 69-2, at 12 ¶ 10, 14 ¶ 4.  But as previously discussed, Ms. Burke confirmed that

20   Defendant was not the reason she left Plaintiff.  Aside from reiterating that further

21   discovery will disclose which patients left his practice, Plaintiff has not provided any

22   supporting evidence, especially since four witnesses testified in their depositions that

23   they were able to fill their prescriptions at other pharmacies and that none of them left

24   Plaintiff's practice because of Defendant's actions.

25          Because Plaintiff cannot satisfy the economic harm element, his claims for IIPEA

26   and NIPEA cannot survive.  Defendant's Motion is thus GRANTED as to both claims.

27   ///

28   ///

1

        **C.**      **Fourth Claim for Relief:  Defamation**

2           Under California law, the elements of a defamation claim are "(a) a publication

3 that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency

4 to injure or that causes special damage." Taus v. Loftus, 40 Cal. 4th 683, 720 (2007).  A

5 publication is communication of the allegedly defamatory statement "to a third person

6 who understands its defamatory meaning as applied to the plaintiff." Shively v.

7 Bozanich, 31 Cal. 4th 1230, 1242 (2003).  The statement need not be published to the

8 "public at large; communication to a single individual is sufficient." Smith v. Maldonado,

9 72 Cal. App. 4th 637, 645 (1999).  Nor must the statement be intentionally

10 communicated to a third person.  Haley v. Casa Del Rey Homeowners Ass'n, 153 Cal.

11 App. 4th 863, 877–78 (2007).  On the contrary, a defamatory statement negligently

12 communicated to a third party will suffice.  Id.  A statement is negligently communicated

13 "[i]f a reasonable person would recognize that an act creates an unreasonable risk that

14 the defamatory matter will be communicated to a third person." Id. at 878–79.

15           Plaintiff alleges that Defendant's employees made the following statements to his

16 patients:  (1) Plaintiff lost his license to practice medicine; (2) Plaintiff's license was

17 "revoked"; (3) Plaintiff is under investigation by the DEA and/or the Food and Drug

18 Administration; (4) Plaintiff is "being investigated" and is "under review" for writing too

19 many prescriptions; (5) Plaintiff and his medical office were creating "fake" and

20 "fraudulent" pill prescriptions; and (6) Defendant sent a letter to Plaintiff stating that they

21 would no longer fill any prescription written by him.  See SAC, ECF No. 23 ¶ 2; Ex. G,

22 Maxwell Decl., ECF No. 66-5, at 82 (Plaintiff's response to Defendant's interrogatory

23 asking for "each and every statement and/or other information that [Plaintiff] contend[s]

24 was defamatory and/or falsely made about [him] by any RITE AID employee").

25 However, all four of Plaintiff's patients testified at their depositions that none of

26 Defendant's employees made any of these statements to them.  See Ex. H, Burke Dep.,

27 id., at 94–96; Ex. I, Fenton Dep., id., at 109–10; Ex. J, Smith Dep., id., at 116–17; Ex. K,

28 Guirgis Dep., id., at 128–30.  As such, Plaintiff cannot show that defamatory statements

1    were made and thus, his defamation claim fails.  Accordingly, Defendant's Motion is

2    GRANTED on this claim.

3

4                                 **CONCLUSION**

5

6         For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF

7    No. 66, is GRANTED.  The Clerk of Court is directed to enter judgment in favor of

8    Defendant and to close the case.

9         IT IS SO ORDERED.

10    Dated:  May 23, 2023

11

12                                MORRISON C. ENGLAND, JR.

                                SENIOR UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28